PER CURIAM.
Troy Victorino appeals an order of the circuit court denying his motion to vacate his convictions of first-degree murder and sentences of death filed under Florida Rule of Criminal Procedure 3.851. Victo-rino also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the postconviction court’s order and deny Vic-torino’s habeas petition.
I. BACKGROUND
In 2006, Troy Victorino was convicted of six counts of first-degree murder for the deaths of Erin Belanger, Roberto Gonzalez, Michelle Nathan, Anthony Vega, Jonathon Gleason, and Francisco “Flaco” Ayo-Roman; one count of abuse of a dead human body; one count of armed burglary of a dwelling; one count of conspiracy; and one count of cruelty to an animal. Victorino v. State, 23 So.3d 87, 93 (Fla.2009). On appeal, this Court set out the facts of the crimes:
On Friday, July 30, [2004,] Erin Belan-ger contacted police concerning suspicious activity at her grandmother’s vacant house on Providence Boulevard in Deltona. Without the owner’s permission, Victorino and [codefendant Jerone] Hunter had recently moved into the home with their belongings. On Saturday, Belanger again contacted police; this time she reported that several items were missing from her grandmother’s house.
Late Saturday night, Victorino appeared at Belanger’s own residence on Telford Lane. He demanded the return of his belongings, which he believed Be-langer had taken from the Providence Boulevard residence. Shortly after leaving Belanger’s residence early on the morning of Sunday, August 1, Victo-rino contacted law enforcement to report the theft of his belongings from the Providence Boulevard residence. The responding officer advised Victorino that he had to provide a list of the stolen property. This angered Victorino, and he said, “I’ll take care of this myself.”
A short time later, Victorino met Brandon Graham and codefendants [Robert Anthony] Cannon and [Michael] Salas, who were in Cannon’s Ford Expedition (the SUV). Codefendant Hunter and several young women were also in the SUV. Victorino told them that Be-langer and the other occupants of the Telford Lane house had stolen his belongings and that he wanted them to go fight Belanger and the others. According to Graham, Victorino and the occupants of the SUV all went in the SUV to the Telford Lane residence. While Vic-torino remained in the SUV, the young women went into the residence armed with knives. The young men stood outside holding baseball bats, and Hunter *483 yelled for the occupants to come out and fight. The group left in Cannon’s SUV, however, after victim Ayo-Roman yelled “policía.”
[[Image here]]
The following morning, Thursday, August 5, Graham, Salas, and Cannon met with Victorino and Hunter at their residence. There, Victorino outlined the following plan to obtain his belongings from Belanger. Victorino said that he had seen a movie named Wonderland in which a group carrying lead pipes ran into a home and beat the occupants to death. Victorino stated that he would do the same thing at the Telford Lane residence. He asked Graham, Salas, and Cannon if they “were down for it” and said to Hunter, “I know you’re down for it” because Hunter had belongings stolen as well. All agreed with Victori-no’s plan. Victorino described the layout of the Telford Lane residence and who would go where. Victorino said that he particularly wanted to “kill Fla-co,” and told the group, “You got to beat the bitches bad.” Graham described Victorino as “calm, cool-headed.” Hunter asked if they should wear masks; Victorino responded, “No, because we’re not gonna leave any evidence. We’re gonna kill them all.”
[[Image here]]
Around midnight on Thursday, August 5, a witness saw Victorino, Salas, Cannon, and Hunter near the murder scene on Telford Lane. Cannon, a State witness, testified that he and Salas went because they were afraid Victorino would kill them if they did not. Cannon further testified that he, Victorino, Hunter, and Salas entered the victims’ home on the night of the murders armed with baseball bats.
On the morning of Friday, August 6, a coworker of two of the victims discovered the six bodies at the Belanger residence and called 911. Officers responding to the 911 call arrived to find the six victims in various rooms. The victims had been beaten to death with baseball bats and had sustained cuts to their throats, most of which were inflicted postmortem. Belanger also sustained postmortem lacerations through her vagina up to the abdominal cavity of her body, which were consistent with having been inflicted by a baseball bat. The medical examiner determined that most of the victims had defensive wounds. The front door had been kicked in with such force that it broke the deadbolt lock and left a footwear impression on the door. Footwear impressions were also recovered from two playing cards, a bed sheet, and a pay stub. All of these impressions were linked to Victorino’s Lugz boots. Furthermore, DNA testing linked bloodstains on Victorino’s Lugz boots to several of the victims. A dead dachshund, a knife handle, and a bloody knife blade were also recovered from the crime scene.
[[Image here]]
At trial, Victorino testified in his defense. He admitted that he believed that Belanger had taken his property from the Providence Boulevard residence. However, he denied meeting Graham, Cannon, or Salas at his residence on August 5, testifying instead that he was at work. He further denied committing the murders and offered an alibi — that he was at a nightclub on the night of the murders. Two friends testified on behalf of Victorino and corroborated his alibi.
Hunter and Salas also testified in their defense. Each described his role in the murders and corroborated the other testimony and evidence offered at trial, including the evidence of the meet *484 ing at which Victorino planned the murders and the agreement to participate. They further testified that Victorino attempted to establish an alibi by making an appearance at the nightclub.
Victorino, 23 So.3d at 91-93.
During the penalty phase, the parties stipulated that Victorino was on felony probation at the time of the murders, and the State introduced victim impact statements. Victorino then presented three expert witnesses and several relatives and friends. Dr. Joseph Wu, a psychiatrist, testified that a PET scan revealed Victori-no’s frontal lobe was less active than normal. Dr. Charles Golden, a neuropsychol-ogist, testified that Victorino had some frontal lobe impairment and severe emotional problems. Dr. Jeffrey Danziger, a psychiatrist, testified that Victorino had an IQ of 101, a long history of physical and emotional abuse by his father, and a history of mental health problems, including several suicide attempts. Dr. Danziger also testified that Victorino experienced an incident of sexual abuse. Victorino’s friends and family testified about Victori-no’s mental health problems, the frequent physical abuse by his father, and Victori-no’s character and good deeds. In rebuttal, the State presented Dr. Lawrence Holder, an expert in radiology and nuclear medicine, who testified that Victorino’s PET scan was normal. Id.' at 93-94.
The jury convicted Victorino of first-degree murder of all six victims and recommended death sentences for the murders of Belanger, Gonzalez, Gleason, and Ayo-Roman. After the Spencer v. State, 615 So.2d 688 (Fla.1993), hearing, at which the State submitted an additional written victim impact statement, the trial court imposed four death sentences, two life sentences, and additional terms for the non-capital crimes.
The trial court found five aggravating factors applicable to four of the murders: (1) the defendant had a prior felony conviction and was on probation at the time of the murders (moderate weight); (2) the defendant had prior capital felony convictions (very substantial weight); (3) the defendant committed the murders in the course of a burglary (moderate weight); (4) the murders were especially heinous, atrocious, or cruel (HAC) (very substantial weight); and (5) the murders were cold, calculated, and premeditated (CCP) (great weight). In addition, the court found a sixth aggravator applicable to the murders of Gleason and Gonzalez — that the murders were committed to avoid arrest (substantial weight). The trial court found no statutory mitigation but did find the following nonstatutory mitigating factors: (1) Victorino had a history of mental illness (some weight); (2) he suffered childhood physical, sexual, and emotional abuse (moderate weight); (3) he was a devoted family member with family support (little weight); (4) he did some good deeds (very little weight); (5) he exhibited good behavior at trial (very little weight); (6) he was a good inmate (little weight); (7) he was a good student who earned awards (little weight); (8) he had an alcohol abuse problem (very little weight); and (9) he had a useful occupation (very little weight). Vic-torino, 23 So.3d at 94-95.
Victorino raised sixteen claims on direct appeal. Regarding the guilt phase, Victo-rino asserted that the trial court erred by: (1) denying Victorino’s pretrial motion to suppress DNA samples and nail scrapings; (2) denying his motion to suppress physical evidence seized from his residence; (3) denying his motion to sever his trial from that of the codefendants; (4) admitting evidence of uncharged misconduct; (5) using the “and/or” conjunction between the names of the codefendants in the jury instructions; (6) moving the trial from Vo- *485 lusia County to St. Johns County; (7) denying his request for additional peremptory challenges; (8) denying his motion for mistrial regarding Cannon’s testimony; (9) denying his motion for judgment of acquittal; and (10) denying him due process regarding his arrest and admitting irrelevant evidence. Regarding the penalty phase, Victorino argued: (11) the HAC aggravator is unconstitutional and inapplicable; (12) the CCP aggravator is unconstitutional and inapplicable; (18) he was under extreme mental or emotional disturbance at the time of the crimes; (14) his sentences are disproportionate to those of his codefendants; (15) Florida’s death penalty scheme is unconstitutional; and (16) he should be retried because of the cumulative effect of the errors that occurred. Victorino, 28 So.3d at 95,103.
This Court determined that most of Vic-torino’s issues on appeal were unpreserved for review, waived, or without merit. This Court also concluded that the use of the “and/or” conjunction in some of the jury instructions was preserved error but determined that the error was harmless. Id. at 101.
In August 2011, Victorino filed an amended initial motion for postconviction relief under rule 3.851, in which he raised seventeen claims. Victorino alleged that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing that the Florida Department of Law Enforcement (FDLE) crime lab in Orlando had a DNA contamination problem at the time of the Telford Lane investigation and violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by allowing FDLE Crime Lab DNA Analyst Emily Varan to testify about the lab’s analysis of items collected in this case. Victorino also alleged that the trial court erred in failing to find that his death sentences are illegal under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). And in the remaining claims, Victorino alleged that trial counsel was ineffective for: (1) not objecting to the 911 emergency phone call recording; (2) failing to timely object when codefendant Cannon testified against Victorino and then refused to answer questions on cross-examination; (3) not raising “calls for speculation” and “calls for opinion of a lay witness” objections to questions eliciting testimony about what the codefendants were thinking; (4) failing to hire and use a defense DNA and blood-spatter expert; (5) failing to object to an improper expert statement about DNA evidence; (6) not objecting to prosecutor statements which asked the jurors to imagine what the victims felt; (7) not objecting to prosecutorial remarks that aroused fear in the jurors; (8) failing to rebut the State’s argument that Victorino entered the Telford Lane house to commit the crime of armed burglary; (9) admitting during closing argument that the “prosecution has done a wonderful job here”; (10) not objecting to improper victim impact testimony; (11) failing to evaluate the alibi witnesses and presenting an unbelievable and damaging alibi defense; (12) not objecting to gruesome photographs; (13) failing to present the mitigation testimony of Mindy Pouliot and Dorona Edwards; (14) committing errors that had a cumulative effect; and (15) failing to object to the State’s argument that the State prosecutes only those who are truly guilty.
The postconviction court conducted an evidentiary hearing, at which Victorino called his cousin, Dorona Edwards, and his trial attorneys, Jeff Dowdy and Michael Nielsen. The State did not call any witnesses. In February 2012, the postconviction court issued an amended order denying relief. State v. Victorino, No. 2004-1378-CFAWS (Fla. 7th Jud. Cir. Feb. 17, 2012) (Postconviction Order).
*486 Victorino appeals the postconviction court’s order denying relief. Victorino contends that the postconviction court erred in denying portions of all of his claims except for the Bmdy/Giglio claim and two claims of ineffective assistance of counsel. In addition, Victorino filed a petition for a writ of habeas corpus, asserting that appellate counsel performed ineffectively by failing to argue on direct appeal that State witness Cannon’s refusal to be cross-examined was fundamental error.
II. MOTION FOR POSTCONVICTION RELIEF
Victorino asserts that the postconviction court erred in denying thirteen of his claims of ineffective assistance of counsel. Additionally, Victorino contends that the postconviction court erred in denying his claim that his death sentences are unconstitutional under Ring.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient .performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. at 687, 104 S.Ct. 2052. For the second prong, “Strickland places the burden on the defendant, not the State, to show a ‘reasonable probability that the result would have been different.” Wong v. Belmontes, 558 U.S. 15, 27, ISO S.Ct. 888, 175 L.Ed.2d 328 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Strickland does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 44, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94,104 S.Ct. 2052).
This Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). For the reasons explained below, we affirm the postconviction court’s order denying relief. Victorino did not demonstrate that he was prejudiced by any error made by trial counsel, and his claim based on Ring was procedurally barred and without merit.
A. Admission of Recording of 911 Call
Victorino asserts that his trial counsel should have objected to the 911 call recording that was played during the guilt phase on the basis of section 90.403, Florida Statutes (2006), which provided that “[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” The postconviction court correctly concluded that trial counsel did not err by not objecting to the recording.
At trial, the State called Christopher Carroll as its first witness. Carroll testified that on the morning of August 6, 2004, he went to the Telford Lane home to pick up his employees Vega and Gonzalez. Carroll explained that when he arrived, no one answered the doorbell, and when he knocked on the door, it popped open because it had been broken. When he entered the room, he saw that a bed was tipped on its side and covered in blood. Carroll stated that at that point, he called *487 911. The State then played an audio recording of Carroll’s 911 call. The court reporter transcribed the call as follows:
911: 911. Where’s the emergency?
CALLER: It’s at 3106 Telford.
911: That’s in Deltona.
CALLER: Yes.
911: And what’s the problem?
CALLER: I think it’s a murder. I went to pick up my guys today and I go over here, the door’s kicked in, and everybody else is supposed to be at work, and my girlfriend works at Burger King and I come in and the door’s kicked in and I see blood. That’s all I see.
911: Okay. On the door or where?
CALLER: No, it’s in the bedroom. I walked in—
911: (inaudible.) You (inaudible) walked in there?
CALLER: Yes, I walked in and—
911: Okay. Is she in there? Is anybody else in there?
CALLER: There’s four or five people in there and they’re just all laying on the floor, and I yelled and yelled and yelled and no one answered, and I walked in and just looked in the bedroom and I see blood on the bed and I stopped and backed up.
The record established that trial counsel made a strategic decision not to object to the recording. At the evidentia-ry hearing, attorney Dowdy testified that he thought the recording was admissible because it fell under the excited utterance hearsay exception and that it was not unduly inflammatory because Carroll was not “screaming or yelling.” Dowdy then further explained that he did not object to the recording because that piece of evidence was an example of where he and co-counsel “feel it might be better not to object if we don’t feel [the objection is] really going to get us anywhere.”
Victorino has not proven deficiency because trial counsel’s decision was reasonable. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) (“[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”). Carroll’s call was probative of the time of the killings and the fact that the perpetrator or perpetrators forcefully entered the house. It also established the context for the testimony of the law enforcement personnel who responded to the crime scene. The danger of unfair prejudice, in contrast, was minimal. Athough the postconviction court agreed with Victorino’s description of the call as “emotionally-charged,” Postcon-viction Order at 6, the recording played to the jury was brief and Carroll did not implicate Victorino when speaking to 911. Thus, Victorino has not demonstrated that the potential for unfair prejudice from the recording substantially outweighed its probative value. Because an objection under section 90.403 would not have been sustained, Dowdy’s decision not to object to the recording was reasonable under the norms of professional conduct. Raleigh v. State, 932 So.2d 1054, 1064 (Fla.2006) (“[CJounsel cannot be deemed deficient for failing to make a meritless objection.”).
B. Cross-Examination of Robert Anthony Cannon
Victorino next contends that defense counsel should have objected, requested a curative instruction, and moved for a mistrial when State’s witness Robert Anthony Cannon refused to be cross-examined, thereby violating Victorino’s right under the Sixth Amendment to cross-examine the witnesses against him. The postconviction court denied relief, reasoning that Victori-no proved neither deficiency nor prejudice. *488 We conclude that Victorino is not entitled to relief based on trial counsel’s failure to object to Cannon’s refusal to be cross-examined. Trial counsel’s response to Cannon’s testimony fell “outside the broad range of reasonably competent performance under prevailing professional standards.” Schoenwetter v. State, 46 So.3d 535, 546 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla. 1986)). Victorino did not, however, demonstrate that he was prejudiced by trial counsel’s error.
Under the Confrontation Clause of the Sixth Amendment, a defendant has a right to effectively cross-examine the witnesses against him. See Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (“[T]o make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.”); McDuffie v. State, 970 So.2d 312, 324 (Fla.2007) (“The right of a criminal defendant to cross-examine adverse witnesses is derived from the Sixth Amendment and due process right to confront one’s accusers. One accused of [a] crime therefore has an absolute right to full and fair cross-examination.”).
This right to cross-examination may be violated where a witness answers questions from the prosecution but refuses to answer the defense’s questions. For example, in Kelly v. State, 425 So.2d 81 (Fla. 2d DC A 1982), a witness testified during direct examination that the defendant was at the scene of a drug transaction but, on cross-examination, refused to answer questions about his pending charge of soliciting a bribe. Defense counsel moved to strike the witness’s testimony, and the trial court denied the motion. On appeal, the Second District Court of Appeal reasoned that “[t]he right of cross-examination, of course, includes the right to examine a witness as to matters affecting his credibility, including a possible motive for testifying.” Id. at 83. Accordingly, the Second District concluded that the “denial of the right to explore on cross-examination possible bases for impeaching the credibility of the witness amounts to a denial of rights under the sixth amendment” and reversed and remanded for a new trial. Id. at 84. See also Hall v. State, 381 So.2d 683, 689 (Fla.1980) (“Where, as here, the codefendant’s invocation of his fifth amendment privilege precludes such questioning by the defendant, the principles of Bruton [v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] and Douglas [u Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)] have been violated.”).
Like the witness in Kelly, Cannon inculpated the defendant during the State’s direct examination and then refused to answer questions relevant to his credibility on cross-examination. Specifically, on direct examination, Cannon testified that: (1) he knew that Victorino intended to kill the people residing at the Telford Lane home; (2) he and Salas were intimidated by Victorino; and (3) the four men entered the home armed with baseball bats. On cross-examination, Cannon provided some biographical information and some details about his plea agreement, but when Victo-rino’s counsel attempted to ask Cannon about a letter he allegedly wrote in which he suggested that “everyone” “blame [Vic-torino] for what happened,” Cannon refused to answer whether the letter was in his handwriting or whether he wrote any letters from jail.
Because Cannon gave direct testimony implicating Victorino but then refused to be cross-examined about whether he colluded to blame Victorino, Cannon’s *489 testimony violated Victorino’s right to effective cross-examination under the Sixth Amendment. See Kelly, 425 So.2d at 83. And as the Second District explains in Kelly, if “a defendant’s right to cross-examination on such matters [as a witness’s credibility] is thwarted, the remedy is to strike the witness’ testimony.” 425 So.2d at 84 (citing generally United States v. Cardillo, 816 F.2d 606 (2d Cir.1963)). See also Douglas, 380 U.S. at 423, 85 S.Ct. 1074 (“On these facts, it is clear that the defense brought the objection to the attention of the court at several points, at any of which corrective action could have been taken by stopping the questioning, excusing the jury, or excluding the evidence.”). Accordingly, reasonably competent counsel would have objected to Cannon’s refusal to testify and requested a curative instruction excluding Cannon’s testimony from the jury’s consideration, and such a timely objection likely would have resulted in the trial court excluding Cannon’s testimony.
Victorino speculates that an instruction to disregard Cannon’s testimony would not have been sufficient to cure the prejudice caused by Cannon’s testimony. Victorino thus asserts that defense counsel should have moved for a mistrial and that the trial court would have granted such a motion. But we agree with the postconviction court’s conclusion that the circumstances surrounding Cannon’s testimony did not warrant the granting of a mistrial.
“[T]he power to declare a mistrial and discharge the jury should be exercised with great care and caution and should be done only in cases of absolute necessity.” Knight v. State, 76 So.3d 879, 885 (Fla.2011) (quoting England v. State, 940 So.2d 389, 402 (Fla.2006)), cert, denied, - U.S. -, 132 S.Ct. 2398, 182 L.Ed.2d 1038 (2012). “The granting of a motion for mistrial is not based on whether the error is ‘prejudicial.’ ” Id. Instead, a mistrial may be granted only “when an error is so prejudicial as to vitiate the entire trial,” such that a mistrial is “necessary to ensure that the defendant receives a fair trial.” Id. (quoting respectively England, 940 So.2d at 401-02, and McGirth v. State, 48 So.3d 777, 790 (Fla. 2010), cert, denied, — U.S. -, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011)). Vic-torino has not demonstrated that the improper testimony in his case was so harmful as to merit a mistrial.
Cannon’s refusal to be cross-examined did not vitiate Victorino’s trial. Cannon’s comments implicating Victorino were brief and unelaborated. While Cannon was on the stand for some time, only a few lines of testimony were harmful to Victorino. Cannon testified that Victorino intended to harm the residents of the Tel-ford Lane home but did not testify that Victorino actually inflicted any blows. Further, except for Cannon’s statement that he was intimidated by Victorino, each of the incriminating points made by Cannon was established by other evidence that is not the subject of a postconviction challenge. As a result, Cannon’s testimony was not essential to the State’s case against Victorino.
Rather, when considered in context, Vic-torino’s case is similar to other first-degree murder cases in which this Court has affirmed the denial of motions for mistrial that were based on a witness testifying that the defendant was violent or dangerous. See, e.g., Knight, 76 So.3d at 885-86 (concluding that witness’s comment that when he saw police at his residence, he assumed that the victim and the defendant “got into an argument or something because [he knew Knight’s] violent background” was not so prejudicial as to prevent Knight from receiving a fair trial); Rogers v. State, 783 So.2d 980, 1000-01 (Fla.2001) (concluding that irrelevant testi *490 mony during penalty phase about defendant assaulting two individuals by brandishing a knife did not require a mistrial).
Furthermore, trial counsel’s failure to request that the trial court exclude Cannon’s testimony does not undermine confidence in Victorino’s convictions or sentences. As found by the postconviction court, the incriminating portions of Cannon’s testimony were substantially cumulative to other evidence presented at trial. A defendant is not prejudiced’ by the improper admission of evidence if the evidence is merely cumulative. See Lynch v. State, 2 So.3d 47, 66-67 (Fla.2008) (“Therefore, the material substance of Lynch’s phone conversations with his wife would have been placed in evidence through the testimony of other witnesses, and Lynch has suffered no prejudice in this regard.”).
Both Brandon Graham, a coconspirator who withdrew before the attack, and Salas testified that before entering the Telford Lane home, Victorino expressed his intent to kill the occupants. Codefendants Salas and Hunter testified that they, along with Cannon and Victorino, all armed with baseball bats, entered the Telford Lane home on the night of the murders. Finally, while the other witnesses could not testify to Cannon’s feeling of intimidation or his motive for participating in the crimes, Graham, Salas, and Hunter all testified that they were afraid of Victorino, and Salas and Hunter added that they participated in the attack because they feared Victorino would harm them if they did not participate.
Based on the foregoing, while reasonably competent trial counsel would have objected to and taken steps to exclude Cannon’s testimony, Cannon did not provide the jury or judge with novel information about Victorino or his role in the charged offenses. Cannon’s testimony was far from being the linchpin of the State’s case. Cannon’s testimony merely “lent further support to ... fact[s] already known to the jury” and judge. Cherry v. State, 781 So.2d 1040, 1051 (Fla.2000). Accordingly, Victorino was not prejudiced by trial counsel’s error.
C. Speculative Lay Opinion Evidence
Relying on section 90.604, Florida Statutes (2006), which provides that a “witness may not testify to a matter unless ... the witness has personal knowledge of the matter” and section 90.701, Florida Statutes (2006), which sets out the circumstances in which a lay witness may testify in the form of an opinion, Victorino contends that defense counsel erred on four occasions by not objecting to testimony that was in the form of speculation or an improper lay opinion. The postconviction court denied relief, reasoning that while objections to the testimony likely would have been sustained, the testimony was “inconsequential” and Victorino, therefore, did not demonstrate prejudice. Postcon-viction Order at 12. The postconviction court did not err in determining that Vic-torino failed to demonstrate prejudice.
Victorino first asserts that counsel was ineffective regarding a portion of witness Graham’s testimony. When asked if Salas had to be “egged on or pushed” by Victorino during a confrontation on Sunday, August 2, 2004, Graham answered: “No, but I guess he wanted to impress him.” “I guess he wanted to impress [Vic-torino].” Second, Victorino contends that trial counsel should have objected when witness Christopher Craddock was asked why he and Graham did not do anything to try to stop the home invasion, and he answered: “We didn’t do anything because we didn’t think anything — like anything was going to happen at all.” Third, Victo-rino argues that counsel should have objected when Salas testified that he and *491 Cannon were uncertain whether Victorino was serious about his plan but went along, reasoning: “We would be a liability. We were the only people that know if something happens.” And fourth, Victorino contends that trial counsel should have objected to Salas’s statement: “Me and Cannon figured that we couldn’t get out of it. When [Victorino] said that he wanted to go into this house and come out, not leave nobody, it’s not like we could have dropped him off or anything. He was in the car. Couldn’t go nowhere.”
We agree with the postconviction court that Victorino has not demonstrated that the witnesses’ statements, even if objectionable, resulted in prejudice. See Hurst v. State, 18 So.3d 975, 996 (Fla.2009) (“[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.” (quoting Preston v. State, 970 So.2d 789, 803 (Fla.2007))).
The first two answers, even if improperly speculative, did not prejudice Victorino because they provided cumulative evidence. See Lynch, 2 So.3d at 66-67. Graham’s testimony about Salas’s behavior is functionally equivalent to Salas’s own testimony that he was intimidated by Victorino and that he participated in the events leading up to the Telford Lane home killings in order to avoid displeasing Victorino. As for the second answer, witness Graham testified that he did not contact law enforcement before the defendants went to the Telford Lane home because, while he was concerned about the possible crimes, he also had doubts about whether the defendants were going to go through with the plan. Because Graham himself testified to these thoughts, Craddock’s consistent speculation about Graham’s thoughts is cumulative.
Turning to the third and fourth challenged answers, because reasonably competent counsel would have succeeded in excluding Cannon’s testimony, Salas’s testimony about Cannon’s thoughts should not be considered cumulative. Nevertheless, when considered in the context of the overwhelming evidence against Victorino that was properly admitted, Salas’s comments about the pressure to participate felt by Cannon do not undermine confidence in Victorino’s convictions or sentences.
The record in this case strongly supports the jury’s verdict — convicting Victo-rino of six counts of first-degree murder, one count of abuse of a dead body, one count of armed burglary, one count of conspiracy, and one count of cruelty to an animal — regardless of whether Cannon acted due to pressure from Victorino. Unchallenged portions of the testimony by Hunter, Salas, and Graham established that Victorino was the person who proposed attacking the occupants of the home; that Victorino solicited assistance from the codefendants; and that the group spent several hours preparing for the attack. Victorino, 23 So.3d at 92-93. In addition, Hunter and Salas testified about the events in the home. Hunter testified that Victorino kicked in the door, hit victim Gleason on the head, fought with Vega, and that after initially exiting the house, Victorino reentered with a switchblade. Salas in turn testified that when he entered the third bedroom, he saw Victori-no — and none of the other codefendants— standing over victims Ayo-Roman and Be-langer, who were not moving, and that just before Salas left the room, Victorino, holding Belanger’s foot in one hand and a bat in the other, stated, “watch what I do to this bitch.” Salas also testified that he heard Victorino confess to inserting his bat into Belanger’s vagina and killing the dog that was in the residence. Finally, blood from several of the victims was found on *492 the boots that Victorino was filmed wearing on the night of the killings. Given this record, any improper evidence that Cannon was intimidated by Victorino -does not undermine confidence in the conviction.
As for the penalty phase, any improper evidence that Cannon was afraid of Victorino is irrelevant to the aggravating and mitigating factors. Whether Cannon feared Victorino does not change Victori-no’s criminal record or how Victorino committed the murders. Victorino asserts that the speculative testimony contributed to the in-the-course-of-a-burglary aggravating factor, but Victorino does not explain how any improper evidence that Cannon feared Victorino diminishes the evidence that Victorino forcibly entered the Telford Lane home to commit a criminal offense. See § 810.02(b)(1), Fla. Stat. (2004) (“ ‘[BJurglar/ means: 1. Entering a dwelling, a structure, or a conveyance with the intent to commit an offense therein.... ”). Similarly, evidence of Cannon’s mental state is irrelevant to the mitigating factors found by the trial court. Cannon’s fear has no bearing on Victorino’s health, his upbringing, how he behaved to his family and individuals other than the codefen-dants, or how he behaved in court or on the job.
Based on the foregoing, even if trial counsel erred by not objecting to the testimony identified in this issue and by not objecting to Cannon’s testimony as addressed in issue B above, Victorino was not prejudiced. Accordingly, the postcon-viction court did not err in denying relief.
D. Golden Rule Argument
In this claim, Victorino asserts that trial counsel erred by not objecting to the underlined portion of the following statement made by the prosecution during guilt phase closing arguments:
When we began this trial I read the names of the six dead young people. You know their names now. You’ll probably never forget them. I hope you forget theirs after you do your job.
On August the 6th, August the 5th and 6th, when these six young people went to sleep in their house on Telford in Deltona, they could not have imagined in their worst nightmares that two years later, 100 miles away, 12 strangers would go in to look at photographs of their broken, sometimes naked, bodies. And of the 16 people that looked at them, 12 would ultimately decide who the killers were and perhaps what to do with them.
Before this day ends, you will begin, and perhaps finish, deciding who killed them. You, and only you, have that authority. You, and only you, have that responsibility. You, alone, issue the verdicts.
It’s a rather orderly process, as it should be. We lawyers will get through telling you what we believe the evidence shows, and that’s what I’m going to tell you is what I believe the evidence shows. His Honor will instruct you on the law.
(Emphasis added.) Victorino contends that the prosecutor’s comment was an impermissible golden rule argument.
The postconviction court concluded that the comment was not a golden rule argument, and that as a result, trial counsel did not err by not objecting. The posteonviction court did not err. Because the comment was not objectionable, trial counsel was not ineffective for not objecting. See Rogers v. State, 957 So.2d 538, 549 (Fla.2007) (“[T]rial counsel cannot be deemed ineffective for failing to object to arguments that are proper.”).
“ ‘Golden rule’ arguments are arguments that invite the jurors to place *493 themselves in the victim’s position during the crime and imagine the victim’s suffering.” Mosley v. State, 46 So.3d 510, 520 (Fla.2009). “ ‘[A] common-sense inference as to the victim’s mental state’ may be the basis of proper argument” and such arguments are not improper golden rule arguments unless they “attempt to place the jury in the position of the victim” so that the jurors “ ‘imagine the victim’s final pain, terror and defenselessness.’ ” Merck v. State, 975 So.2d 1054, 1064 (Fla.2007) (quoting Rogers, 957 So.2d at 549, and Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985)).
The comment at issue in this case is similar to the comment in Pagan v. State, 830 So.2d 792 (Fla.2002). In Pagan, this Court concluded that the prosecution did not make a golden rule argument by stating: “Now [the defendant] wants to get away with [the murders]. You are the only force on earth that can prevent that from happening.” Id. at 812. Similarly, the comment in this case neither asked the jurors to put themselves in the place of the victims nor to imagine the victims’ suffering at the time of the crime. When read in context, the comment acknowledged that a change of venue occurred and then, as in Pagan, explained to the jurors their role in the trial. Accordingly, Victorino has not established that the prosecutor’s remark was objectionable.
E. Hit Man Comment
Next, Victorino asserts that trial counsel erred by not objecting to the underlined portion of the following statement made by the prosecution during guilt phase closing arguments:
[A]n independent act occurs when a person, other than perhaps the direct perpetrator, commits, or attempts to commit, a crime which is not intended to occur and which the person did not participate in and which is outside of and not reasonably foreseeable with regard to the consequences of the common scheme or plan that everyone intended. So — going back to my earlier scenario, so a bank robber goes in with a gun, promises not to kill anybody, the driver doesn’t expect him to kill anybody, he kills anyone, the driver is guilty of murder under our law. Didn’t intend the teller to get shot. In fact, the shooter might have promised him he wouldn’t. That’s not what the law says. The law says you set it up, you participate in it, you are responsible for the foreseeable — reasonably foreseeable consequences.
The instruction goes on to say that if a person was not — if the person was not present when the crime occurred, that, in and of itself, does not establish that it was an independent act. I think one of the examples, I think Ms. Case gave the example of a wife hires a hit man, hit man goes up to New York, kills husband. Wife’s not present. Is she responsible? You better believe it. It’s a good thing, too, or life [might not] be as safe as it is.
People are responsible for consequences of their acts. That’s what the law is founded on. That’s what our society tries to — we try to teach that from the time they’re this big.
There’s another law that deals directly with that aspect called the law of principals, and that is where if someone helps someone else commit a crime, then they must be treated the same as if — the actual perpetrator....
(Emphasis added.) Victorino contends that the underlined portion of the statement was improper because the “obvious intent was to depict Victorino as an organized-crime hit man and to instill fear in the jurors that acquitting Victorino or sentencing him to life instead of death might *494 put themselves in jeopardy.” Initial Brief of Appellant at 56, Victorino v. State, 127 So.Bd 478, 2013 WL 5567079 (Fla.2012) (Initial Brief). The postconviction court did not err in denying relief.
“[C]omments in closing argument [that] are intended to and do inject elements of emotion and fear into the jury’s deliberations ... [are] far outside the scope of proper argument.” King v. State, 628 So.2d 486, 488 (Fla.1993) (quoting Garrón v. State, 528 So.2d 353, 359 (Fla.1988)). But in the instant case, Victo-rino did not demonstrate that the prosecutor’s statement about a wife hiring a hit man was intended to or did inject fear into the minds of the jurors. The prosecutor’s comment about a hit man was made in the context of explaining the legal concepts of principals and independent acts. It was a hypothetical example offered to help the jurors understand the legal concepts that they were to consider regarding the charges against Victorino. Victorino does not explain why the hypothetical example of a wife killing a husband would provoke fear of Victorino or why the jurors would fear retaliation from Victorino if they chose to acquit him or give him the lesser possible sentence of life in prison — decisions that would be to Victorino’s advantage. Thus, Victorino has not demonstrated that reasonably competent counsel would have objected to the comment. See Asay v. State, 769 So.2d 974, 984 (Fla. 2000) (“[T]he defendant bears the burden of proving that counsel’s representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy.”).
F. Armed Burglary
Victorino contends that his counsel erred by not arguing that if Victorino was at the crime scene, he was there to recover his rightfully owned property, not to commit burglary. The postconviction court concluded that Victorino failed to prove either Strickland prong, reasoning that “it is obviously sound trial strategy not to make such trivial arguments in such a serious case” and that the purpose of Vic-torino’s presence at the house could not have changed the jury’s thinking about the murders. Postconviction Order at 16. The postconviction court did not err.
At the evidentiary hearing, attorney Dowdy testified that Victorino was “adamant” about going forward with an alibi defense. Attorney Nielsen confirmed that Victorino insisted on the alibi defense. He stated that Victorino “denied his involvement in this crime, and he has maintained his innocence throughout.” Nielsen further explained that because counsel and Victorino together decided to present an alibi defense, counsel made a corresponding strategic decision not to rebut the State’s armed burglary argument:
Right. So these guys could have gone in there to do a burglary, they could have gone in there to cook a ham — have a ham sandwich. It didn’t really matter. And if we stood and objected and made a big scene out of it, the jury would have been like why are you doing that, you’re telling us your guy’s not even there? So now you’re objecting to everything in the house. What is your — where are you? You’re all over the map. Take a position and go with it. That’s what juries think.
As discussed below in issue I, defense counsel’s strategic decision to present an alibi defense was reasonable. Because counsel did not err by presenting Victorino’s defense that he was not involved in the charged offenses, counsel’s related strategic decision not to challenge the State’s armed burglary theory was also reasonable. See Heath v. State, 3 So.3d 1017, 1028 (Fla.2009) (“[T]he decision to *495 not present inconsistent defenses for fear of harming credibility with the jury was a matter of trial strategy.”); Hannon v. State, 941 So.2d 1109, 1122 (Fla.2006) (“Trial counsel’s performance did not fall below a standard of reasonableness in failing to challenge the credentials of a witness who was not at all relevant to any aspect of Hannon’s defense that he did not commit the murders.... These reasonable strategic decisions were made in an attempt to avoid confusing the jury....”).
G. Complimenting the Prosecution
Victorino contends that by complimenting the prosecution during closing argument, his counsel conceded the case against Victorino. The postconviction court properly concluded that trial counsel made a reasonable, strategic decision to compliment the prosecution and “admit[ted] nothing other than the obvious.” Postconviction Order at 17. The record supports the postconviction court’s conclusion that defense counsel’s compliment was a reasonable, strategic decision.
Victorino and his codefendants Hunter and Salas were tried together. Each defendant’s team gave a closing argument. Attorney Dowdy, who spoke for Victorino, went last and began his guilt phase closing statement as follows:
Good afternoon, ladies and gentlemen. Once again, my name is Jeff Dowdy, my partner, Mr. Nielsen. As you know, we represent Mr. Victorino. You’ve already heard thanks enough. Thank you from our team. The prosecution has done a wonderful job here. They’ve had aid from the additional prosecutors in the case.
Ladies and gentlemen, for over 200 years we’ve had this system. For over 200 years we’ve set laws into place and we have presumptions, principles of law[] and things of that nature. The purpose of this case was to give this man right here, Mr. Troy Victorino, a fair trial.
Attorney Dowdy then went on to argue that the evidence did not support the theory that Victorino participated in the crime and was the ringleader. Dowdy urged the jury not to “fall for this piling on Troy, ganging up on Troy Victorino.”
At the postconviction evidentiary hearing, attorney Dowdy testified that he deliberately made the remark about the prosecution doing a good job before challenging the State’s case. He explained that he compliments the prosecution in almost every case because he and co-counsel “want to make sure that we can try to make [the jurors] comfortable and not to dislike us.” Co-counsel Nielsen also addressed this point, testifying:
You could score points [with the jury] by perhaps being a gentleman and just recognizing the simple fact that it took a tremendous amount of work to put this trial together. And if he said they did a good job, I think it could help us in some way when we’re trying to get that life recommendation. That might be wrong, but I think it’s — I don’t think it hurts to say that.
This Court has concluded that it was reasonable for counsel to adjust defense strategy in an attempt to make a good impression on the jury. See, e.g., Engle v. Dugger, 576 So.2d 696, 700 (Fla. 1991) (concluding that there was no ineffectiveness where defense counsel “adopted a tactical approach not to question the medical examiner’s conclusions in order not to inflame the jury”). In this case, attorney Dowdy merely paid a professional courtesy to the prosecution before challenging the State’s case by attacking the credibility of witnesses and arguing that the evidence was inconsistent with the theory that Victorino committed the of *496 fenses. Thus, the transcript of Dowdy’s closing argument, when read as a whole, refutes Victorino’s allegation that his counsel conceded guilt and failed to advocate on his behalf. Furthermore, Dowdy’s compliment appears particularly appropriate in light of the fact that the prosecution complimented the defense during its closing. Because Dowdy’s strategy was reasonable, Victorino has not established deficiency. See Occhicone, 768 So.2d at 1048.
H. Victim Impact Evidence
Victorino asserts that his trial counsel should have objected to victim impact testimony that indicated that the victims’ family members were grieving and mourning as a result of the deaths. Victo-rino does not argue that the evidence im-permissibly became a feature of the trial but that trial counsel should have objected because such evidence should be per se inadmissible. The postconviction court did not err in denying this claim.
Section 921.141(7), Florida Statutes (2006), provides that in a capital case, once the prosecution has provided evidence of one or more aggravating factors, the prosecution may present victim impact evidence and that:
Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
Evidence of a family member’s grief and suffering due to the loss of the victim is evidence of “the resultant loss to the community’s members by the victim’s death” permitted by section 921.141(7), and the admission of such evidence is consistent with the Supreme Court’s decision in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). See Franklin v. State, 965 So.2d 79, 97 (Fla. 2007) (finding evidence that the victim’s family was devastated and that the victim’s friends were “hurt pretty bad” did not exceed the proper bounds of victim impact evidence as established by section 921.141(7) and Payne); see also Abdool v. State, 53 So.3d 208, 222 (Fla.2010) (“Mr. Sookdeo described the close relationship between his son and daughter and how angry his son had become since her death. Mr. Sookdeo’s testimony about his fear over anger and pain consuming his son is directly related to the impact Amelia’s death had on her family.”), cert, denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011). Accordingly, Victorino has not established that reasonable counsel should have objected to the testimony about grief and mourning. See Raleigh, 932 So.2d at 1064 (“[C]ounsel cannot be deemed deficient for failing to make a meritless objection.”).
I. Alibi Defense
Victorino contends that his counsel was ineffective for presenting an alibi defense. The postconviction court denied relief, reasoning that Victorino insisted on the alibi defense and counsel “clearly did what they could [t]o test the alibi defense,” including confronting Victorino about the incriminating DNA on his shoes. Postconviction Order at 20. The postconviction court did not err by denying relief.
Competent, substantial evidence supports the postconviction court’s conclusion that the defense adequately investigated Victorino’s alibi defense and made a reasoned, strategic decision to present that defense. At the evidentiary hearing, attorney Dowdy testified that Victorino was “adamant” about going forward with an alibi defense. Attorney Nielsen confirmed *497 that Victorino insisted on the alibi defense. Attorney Nielsen stated that Victorino “denied his involvement in this crime, and he has maintained his innocence throughout.” Nielsen went on to describe the defense’s preparation for presenting Victo-rino’s alibi defense:
So we investigated it and we worked it up and we had a team. We had investigators named the O’Malleys, a husband and wife team, and we went to the places that we were told he was that night during the commission of these crimes, and literally went and — myself and Mr. Dowdy took the time to visit and try to understand exactly what it is that he was explaining to us to be able to prove it to the jury.
At no time did we feel it was our place to tell Mr. Victorino what in fact occurred, okay? That’s not my job.
Now, I have been presented with defenses before that I probably have voiced concern over, but we didn’t have that much of a concern in that regard because Mr. Victorino himself is a very believable witness, and he’s a smart man, and he knew what his position was, and that’s the position we went with.
[[Image here]]
Right. And, you know, it was going well, quite frankly, until I got that lab report, and I remember working on it all weekend, and getting to a point where he showed there was this blood of the victims on [Victorino’s] shoes, and of course that is a problem, you know. But we presented that to our client and let him make the decision as to where to go with it, okay? And so his decision is they’re full of baloney. Someone else put the stuff there. It wasn’t me. I wasn’t at that thing. I didn’t do it. And that is our defense.
When asked if the type of defense was a decision properly left to the client, attorney Nielsen explained that Victorino made the decision in consultation with his attorneys:
Well, I mean, [Victorino] makes it in consultation with his lawyers, but when we presented to him, hey, look, they’re showing us this lab report that now shows they got some victim’s blood on your shoes, kind of like, you know, do you want to tell us anything? You know, it’s, well, they’re wrong, and that’s not right, and I wasn’t there, and you guys know what I’ve told you before for months....
Victorino did not present any evidence to refute counsel’s claim that they, with the help of the O’Malleys, investigated Victori-no’s claim that he was at a nightclub at the time of the offenses.
This strategic decision to present the alibi defense by calling Victorino and two of his friends was reasonable. In Bradley v. State, 38 So.3d 664, 674 (Fla.2010), this Court determined that defense counsel acted competently by choosing to argue an alibi defense, rather than an “independent act theory.” The Court’s decision was based on the fact that “there was evidence to substantiate [the alibi]” but “[o]nly mere speculation supported the theory that Mrs. Jones killed Mr. Jones by striking him with a tool from the garage.” Id. The same reasoning applies here. Victorino’s defense counsel uncovered witnesses — albeit ones of questionable credibility — who were willing to testify in support of Victorino’s alibi. In contrast, Victorino has not demonstrated how counsel could have more effectively challenged the State’s proof or could have persuasively argued the theory that Victo-rino was present at the scene but not a willing participant. As a result, Victorino has not demonstrated that counsel’s defense strategy was unreasonable.
*498 J. Gruesome Photographs
In this issue, Victorino asserts that trial counsel should have objected to “State’s Exhibit 97: Photograph of the victims’ bodies”; “State’s Exhibit 10: Photographs of victim[s] Jonath[o]n Gleason and Anthony Vega, showing their wounds”; “State’s Exhibit 18: Photograph of Victim Michelle Nathan, with trail of blood”; “State’s Exhibit W: Photographs of the dead dachshund dog, ‘George’ ”; and a “[pjhotograph of bloody baseball bat found in one of the bedrooms of the Telford house.” Initial Brief at 80; Defendant’s Amended Initial Rule 3.851(e)(1) Motion for Postconviction Relief at 54, State v. Victorino, No. 2004-1387-CFAWS (Fla. 7th Jud. Cir. filed Aug. 3, 2011). Victorino contends that upon timely defense objection, the exhibits would have been excluded under section 90.403, Florida Statutes (2006), because they created a risk of unfair prejudice that substantially outweighed their probative value.
The postconviction court did not err in denying this claim. Victorino’s allegations regarding two of the exhibits were insufficiently pleaded, and Victorino has not demonstrated that objections to the remaining three exhibits would have been sustained. Accordingly, Victorino did not demonstrate that trial counsel erred by failing to object. Raleigh, 932 So.2d at 1064 (“[Cjounsel cannot be deemed deficient for failing to make a meritless objection.”).
Victorino did not provide sufficient information for this Court to consider his allegations of ineffective assistance of counsel related to “State’s Exhibit 97: Photograph of the victims’ bodies” and the “[p]hotograph of bloody baseball bat found in one of the bedrooms of the Telford house.” Victorino inaccurately asserts that a photograph of the victims, designated “State’s Exhibit 97,” was admitted into evidence on page 1845 of the trial transcript. At that point in the record, State witness Stacy Colton, an FDLE crime laboratory analyst who collected evidence at the Telford Lane home, was testifying about a scale diagram of the home. Col-ton explained that the numbers on the diagram marked where items of interest— such as a knife blade or a bed sheet — were found. She referred to the numbers on the diagram as exhibit numbers. On page 1845 specifically, Colton identified “exhibit 97” as the front door of the home. The diagram, admitted as State’s exhibit 5, confirms that number 97 is the front door, not a photograph of the victims’ bodies. Similarly, while Victorino asserted that a photograph of a bloody bat was introduced into evidence on page 1929 of the trial transcript, that portion of the record does not discuss such an exhibit. Colton testified that a metal bat was found in the home near victim Ayo-Roman, but while the questioning indicates that the bat was shown in a video of the crime scene, the record does not indicate that any still photographs of the bat were admitted into evidence. Because Victorino has not identified which photographs his counsel should have challenged, his claim of ineffective assistance of counsel is insufficiently pleaded regarding those two items. See Geralds v. State, 111 So.3d 778, 809 (Fla. 2010) (“Geralds does not specify which photographs he challenges, did not attach any photographs to his petition.... Accordingly, Geralds did not sufficiently plead this claim.”).
As for the remaining allegations regarding the photographic exhibits, it is apparent from the record that Victorino intended to argue that his trial counsel should have objected to State’s exhibits 10, 19, and 21, not State’s exhibits 10, 18, and W. But while Victorino’s allegations regarding these exhibits were sufficient for *499 this Court to identify the exhibits at issue, Victorino did not establish that an objection to the exhibits on the basis of unfair prejudice would have been successful.
“All relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2006). A limitation on this rule of admissibility is that “[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.408, Fla. Stat. (2006). The fact that “a photograph is prejudicial does not justify its exclusion as evidence; rather, a relevant photograph must be unfairly prejudicial to be excluded.” Hampton v. State, 103 So.3d 98, 115 (Fla.2012) (citing Sexton v. State, 697 So.2d 833, 837 (Fla.1997), cert. denied, — U.S.-, 133 S.Ct. 2027, 185 L.Ed.2d 892 (2013)). Accordingly, “just because a photograph is gruesome does not make the photograph inadmissible.” Id.
“This Court has upheld the admission of [gruesome] photographs when they [were] offered to explain a medical examiner’s testimony, the manner of death, the location of the wounds, or to demonstrate the heinous, atrocious, or cruel (HAC) factor.” McWatters v. State, 36 So.3d 613, 637 (Fla. 2010). This Court also has upheld the admission of gruesome crime scene photographs under section 90.403 where the photographs were used by a witness — other than a medical examiner — to describe the crime scene. For example, in Harris v. State, 843 So.2d 856, 865 (Fla.2003), this Court concluded that any danger of unfair prejudice from photographs showing the victim in a state of decomposition did not outweigh their probative value because the photographs were “relevant to establish the manner in which the murder was committed and to assist the deputy sheriff who described the crime scene to the jury.” See also Pope v. State, 679 So.2d 710, 713-14 (Fla.1996) (concluding that photographs of the bloody bathroom and clothes were admissible where the photographs were relevant to establish the manner in which the murder was committed and to assist the crime scene technician in explaining the condition of the crime scene).
In the instant case, as Colton was questioned about the crime scene, the State presented one poster board of photographs per victim, which Colton used to describe the location and condition of each body. Colton used exhibit 10, which consisted of four photographs, when testifying that victims Gleason and Vega were discovered by law enforcement in the living room of the home. Exhibit 10 also assisted Colton when she explained to the jury that Gleason suffered lacerations and stab wounds — not only blunt-force injuries — indicating that Gleason must have been attacked by one of the codefendants that was armed with a knife. Given that the photographs in exhibit 10 were probative of the critical, disputed issue of which codefen-dant killed which victim, Victorino did not show that an objection to exhibit 10 under section 90.403 would have been sustained.
Similarly, Victorino did not demonstrate that an objection under section 90.403 would have been sustained regarding exhibit 19, which consists of four photographs of victim Nathan. Witness Colton relied on exhibit 19 to describe the location and condition of Nathan’s body, and two of the photographs — those showing a trail of blood that began on the bed located near Nathan’s body and ended under Vega in the living room — provided additional probative value. This blood trail tended to prove that Vega was attacked in the bedroom but then fought with his assailant(s) before collapsing in the living room. Because the exhibit helped Colton explain the *500 crime scene and the likely chain of events that occurred in the home, an objection under section 90.403 would not have been sustained.
Finally, Victorino contends that trial counsel should have objected to State exhibit 21, marked for identification as “W,” which consisted of three photographs depicting a dachshund lying on the floor in the corner of bedroom three and which Colton described as showing the dog’s “crushed or smushed” snout. Any objection to State exhibit 21 under section 90.403 would have been overruled. One of the charges against Victorino was “cruelty to animals,” and the indictment alleged that the defendant “intentionally cause[d] the cruel death of and/or unnecessary pain and suffering to an animal ... by striking and/or stomping ... upon his head, face and/or snout, thereby killing him.” While there was testimony in the record that Victorino stated that he killed the dog, the photographs were uniquely probative of the State’s allegations that Victorino killed the dog in a cruel, painful manner. Because the probative value of the photographs was so high, any danger of unfair prejudice did not substantially outweigh the probative value.
K. Mitigation Witness Dorona Edwards
Victorino contends that his counsel should have called his cousin, Dorona Edwards, as a penalty phase witness. The postconviction court concluded that Victo-rino proved neither deficiency nor prejudice. The postconviction court did not err.
At the postconviction hearing, Edwards testified that Victorino formerly lived nearby and that she would see him once or twice a month. Edwards explained that Victorino was “very loving, very fatherly” toward her young children and that sometime she left her children with Victorino as a babysitter. Edwards testified that she never knew Victorino to do anything illegal and never saw him lose his temper. Regarding Victorino’s childhood, Edwards testified that she saw Vic-torino’s father abuse him. Defense counsel testified that they could not remember the specific reason why Edwards was not called as a mitigation witness at trial. Attorney Nielsen did explain, however, that the defense located a number of people who wanted to speak on Victorino’s behalf and that as a result, it was necessary for the attorneys, the investigators, and Victo-rino to consult and restrict the mitigation presentation. This evidence supports the conclusion that trial counsel made a strategic decision not to call Edwards as a penalty phase witness.
Furthermore, trial counsel’s strategic decision was reasonable. As found by the postconviction court, trial counsel did not err by not calling Edwards because her testimony would have been cumulative to other penalty phase witnesses. See Davis v. State, 928 So.2d 1089, 1108 (Fla.2005) (“[0]nee counsel secured Davis’s mother to testify with regard to all of the pertinent information, his decision to forego further pursuit of other members of Davis’s family and friends was not an unreasonable decision or approach.”).
Edwards testified that: (1) Victorino was abused as a child; (2) Victorino was a nonviolent, trustworthy person; and (3) Victorino was good with children. Other penalty phase witnesses established each of these points. Victorino’s mother, brother, and a mental health expert each testified that Victorino was abused as a child, and the trial court found as a mitigating factor — given “moderate weight” — that Victorino “suffered childhood physical, sexual, and emotional abuse.” Victorino, 23 So.3d at 94. Witness Yvonne Pizarro, Vic-torino’s friend, testified that Victorino was a “gentle giant.” Pizarro further testified *501 that Victorino helped her family by repairing things around the house, that no one in her family had any problems with Victori-no, and that she had once seen Victorino mediate between strangers to avoid a fight. Similarly, Victorino’s friend, John Pacheco, testified that he had never seen Victorino be violent and that during the year they knew each other, Victorino had good impulse control. Finally, Victorino’s mother testified that Victorino, the oldest of six children, was “always taking care” of his younger siblings and “teaching them things,” and his sister testified that Victo-rino attempted to maintain a relationship with his young nephew after being incarcerated.
L. Cumulative Error
The postconviction court did not err in concluding that Victorino is not entitled to relief due to the cumulative effect of the errors identified in his postconviction motion. Victorino was not prejudiced by trial counsel’s failure to move to exclude Cannon’s testimony or to object to the speculative answers given by Graham, Craddock, and Salas. As is explained above in the analysis of issues B and C, the majority of the testimony that could have been excluded was cumulative to properly admitted evidence, and the remaining evidence— testimony that Cannon was intimidated by Victorino — does not undermine confidence in Victorino’s convictions or sentences. Victorino did not identify any additional errors in his remaining postconviction claims. Thus, Victorino’s cumulative error claim is without merit.
M. Prosecutorial Comment Regarding Victorino’s Guilt
Victorino asserts that defense counsel should have objected to the underlined portion of the following closing argument because the prosecutor improperly suggested that the State prosecutes only people who are truly guilty.
[MR. TANNER]: You know, I guess some people say we really threw the book at these guys and did everything we could to charge them with everything we could, and let me say this. That’s the decision! 3 that we make, but we’re very careful what we do. Look at Count VI when you get back in the jury room. It’s Michelle Nathan. Michelle Ann Nathan. Her method of death, based upon the medical evidence, wasn’t quite solid as to exactly how she died. So rather than blunt force trauma, baseball bat or other blunt object, as to the other five, that’s what we said with the five other people, as to Michelle Ann Nathan we said — we said by baseball bat or — baseball bat or blunt object and/or a knife or sharp instrument. It turns out that was true when you heard the rest of the story. The medical evidence indicated that; something different about her stab wounds to the breast. It looked like it was inflicted upon a live person, as opposed to mutilation of the other bodies. So we’re very careful about what we charge. We also didn’t charge—
[[Image here]]
MR. TANNER: We also didn’t charge the mutilation of her body because we attributed those wounds to the mode of death and not to the wanton mutilation that went on with the others.
Now, as you look at these facts — and you’re going to have to decide what to do in the jury room; none of us are going to presume to tell you.
(Emphasis added.)
The postconviction court denied relief, reasoning that the prosecutor’s comments were not objectionable, and that even if defense counsel should have objected, Vic-torino did not prove prejudice. The post-conviction court did not err.
*502 Victorino relies on Hall v. United States, 419 F.2d 582, 583 (5th Cir.1969), in which the Fifth Circuit Court of Appeals determined that the prosecutor erred by stating “we try to prosecute only the guilty.” The Fifth Circuit reasoned:
The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them. Or, arguably it may be construed to mean that as a pretrial administrative matter the defendant has been found guilty as charged else he would not have been prosecuted, and that the administrative level determination is either binding upon the jury or else highly persuasive to it.... The prosecutor may neither dispense with the presumption of innocence nor denigrate the function of the trial nor sit as a thirteenth juror.
Hall, 419 F.2d at 587 (footnote and citation omitted).
In Ruiz v. State, 743 So.2d 1, 5 (Fla. 1999), this Court adopted the reasoning of Hall and disapproved the following closing argument:
What interest, ask yourselves what interest does [State witness] Charles Via, Michael Witty, the Hahns, Dianne Guty and Abraham Machado have in seeing that somebody other than the person responsible for this horrible crime be convicted? What interest do we as representatives of the citizens of this county have in convicting somebody other than the person—
[[Image here]]
... Delio Romanes was charged in this case. What interest is there to bamboozle anybody about Delio’s real role in this case. Ask yourselves that. No one is saying Delio Romanes has clean hands, but what interest does anybody have in saying that Delio Romanes isn’t the person responsible for this if he was?
This Court determined that the prosecutor’s statement was improper because it was tantamount to an argument that “[i]f the defendant wasn’t guilty, he wouldn’t be here.” Id.
In contrast, in Williamson v. State, 994 So.2d 1000, 1011 (Fla.2008), this Court cautioned prosecutors against making the following argument but ultimately determined that defense counsel’s failure to object to it did not constitute ineffective assistance:
You better believe that we filed the charges, because it’s warranted. Robbery against each person in the house who had property in the house that was taken or any control over that property. Burglary against [the] house and two vehicles that were taken or anything taken out of the house.
So, as you analyze these counts, and let’s go down them. We have murder in the first degree of Donna Decker, and also the attempted murder after Bob, Clyde and Carl. Armed burglary of Bob and Donna Decker’s home where the property was taken.
In denying relief, this Court concluded that the argument was:
[N]ot a comment wherein the prosecutor was giving his personal opinion that he believed Williamson was guilty — instead, the statement was to explain that the State filed so many charges because each charge was based on different conduct. The State made this comment when describing each of the charges and then immediately pointed out the evidence in the record to show that each charge was based on different actions.
Id. at 1012 (footnote omitted).
The prosecutor’s argument in Vie-torino’s case is more like the argument in *503 Williamson than those in Ruiz or Hall. As in Williamson, the prosecutor’s argument was designed to explain why the “State filed so many charges,” id. at 1012, and how those charges were based on specific acts attributed to the various defendants. The prosecutor’s comments clarified why the charges regarding two victims differed slightly from the charges pertaining to the other victims, without suggesting that the State had undisclosed information about any of the defendants. Because the prosecutor’s argument was not objectionable, Victorino did not prove that his trial counsel erred. See Rogers, 957 So.2d at 549 (“[Tjrial counsel cannot be deemed ineffective for failing to object to arguments that are proper.”).
N. Ring Claim
Finally, Victorino appeals the postcon-viction court’s denial of his claim that because they were not based on unanimous jury recommendations, his death sentences are unconstitutional under Ring. This claim of trial court error was properly raised and rejected on direct appeal. See Victorino, 23 So.3d at 107-08 (denying Vic-torino’s Ring claim). On the merits of this proeedurally barred claim, Victorino offers no persuasive reason for this Court to depart from its precedent. Victorino relies on Evans v. McNeil, 2:08-14402-CIV, 2011 WL 9717450 (S.D.Fla.2011), but that decision was overruled by Evans v. Secretary, Florida Department of Corrections, 699 F.3d 1249 (11th Cir.2012), cert. denied, Evans v. Crews, — U.S. —, 133 S.Ct. 2393,185 L.Ed.2d 1105 (2013).
III. PETITION FOR WRIT OF HABEAS CORPUS
In his petition for a writ of habeas corpus, Victorino contends that his appellate counsel erred by failing to argue on direct appeal that Victorino’s inability to effectively cross-examine witness Cannon constituted fundamental error. Claims of ineffective assistance of appellate counsel are cognizable in a habeas petition. Freeman v. State, 761 So.2d 1055, 1069 (Fla. 2000). Victorino is not, however, entitled to relief because his allegation of error is refuted by the record. While appellate counsel argued on direct appeal that trial counsel preserved the Confrontation Clause issue for review by moving for a mistrial, appellate counsel also raised the question of whether Cannon’s refusal to testify resulted in fundamental error:
The trial court as a matter of law subjected the Appellant to a co-defendant unwilling to testify in violation of the Fifth Amendment, further denying the Appellant his rights under the confrontation clause of the Sixth Amendment and the taint contributed severely to the Appellant[’]s conviction being fundamentally harmful in error.
Amended Appellant[’]s Brief at 97, Victori-no v. State, 23 So.3d 87 (Fla.2009) (emphasis added). Because the record demonstrates that appellate counsel did argue that Cannon’s refusal to testify constituted fundamental error, Victorino’s habeas claim is without merit.
IV. CONCLUSION
For the reasons stated above, we affirm the postconviction court’s denial of Victori-no’s motion for postconviction relief and deny his petition for a writ of habeas corpus.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.