# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D14-2449
_____

DEVIN LEE BASS,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the circuit court for Santa Rosa County.
John L. Miller, Judge.

December 14, 2018

PER CURIAM.

At a New Year's Eve gathering, Devin Bass got drunk and angry. He hit Cody Healy in the face so hard that Healy fell back into a bonfire. According to an eyewitness, Healy's hair was in flames when he was pulled away, and he "looked dead." Healy was not dead, but he suffered significant injuries and was hospitalized for about a month.

Most of the crowd scattered after the assault, but Bass stuck around. Police soon arrived, and an officer approached Bass and asked what happened. Bass said there had been an altercation but that he knew little about it. The officer decided he should keep an eye on Bass, so he asked Bass to walk with him towards a larger group. Bass and the officer started walking together, but the officer became distracted and soon discovered Bass was no longer with

him. The officer then saw that Bass had returned to his truck and had removed his shirt and hat. Bass was leaning inside the truck, digging around. Concerned Bass was reaching in for a weapon, the officer ordered Bass to step away from the truck, and Bass complied. An officer asked Bass for his name, and Bass lied; he said he was "Dillon Barns." The officers then searched the truck (with Bass's consent) and found an ID card with Bass's picture and real name.

Bass continued to insist he was not Bass, telling officers the truck and identification card belonged to a friend. After further questioning, Bass gave an incorrect birthdate. The officer then placed Bass in the back of his patrol car while he continued with the investigation. After gathering information from witnesses, the officer returned to his patrol car and searched for Bass's information on his computer. At one point, while the officer was running the information, he turned to Bass and said "hey Devin?" and Bass responded "yeah?" The officer then said "I got you," and Bass finally admitted who he was.

The State charged Bass with three counts of aggravated battery with great bodily harm—one count for the attack on Healey, and two counts for separate attacks on other victims. The State also charged Bass with one count of resisting an officer without violence, based on his lying about his identity. The jury convicted Bass of the lesser offense of felony battery against Healey, and it acquitted Bass as to the other victims. It convicted him of resisting an officer. The court sentenced Bass to five years' imprisonment and one year of probation. This is Bass's appeal, which presents six independent issues.

I.

Bass's first argument is that the trial court erred in not giving a requested instruction about character evidence. The proposed instruction would have told the jury to "consider testimony that a defendant is a peaceful person along with all the other evidence." Bass contends that without this instruction, the jury was not adequately instructed on his theory of defense, namely that he was a peaceful person. *See Stephens v. State*, 787 So. 2d 747, 756 (Fla. 2001) (noting that to be entitled to special instruction, defendant must show that "the standard instruction did not adequately cover

2

the theory of defense"). But Bass's theory of defense was that he did not commit the crime. Evidence of his peacefulness supported that theory of defense—as did other evidence—but peacefulness was not an independent defense. The jury concluded Bass was guilty after the court correctly instructed jurors to consider all the evidence, to decide for themselves what evidence was reliable, and to convict only if guilt was proven beyond a reasonable doubt. The court's instructions adequately covered Bass's theory of defense. *See Branch v. State*, 685 So. 2d 1250, 1253 (Fla. 1996) ("The jury in the present case was fully instructed on reasonable doubt and burden of proof and there is no reason to believe that these instructions were insufficient to guide the jury in its deliberations."). We therefore find no abuse of discretion.[1]

## II.

Next, Bass argues that the trial court should have allowed him to interview a juror before denying his motion for new trial. After trial, the court and the parties received correspondence from a juror expressing concerns about how the verdict was reached and doubts as to its correctness. Specifically, the juror indicated concern that the foreman had not presented certain questions to the court, and the juror wrote she "was very rushed" and felt pressured to go along with the majority's decision. Bass moved for a new trial and sought to interview the juror. Bass argued, among other things, that the interview was necessary to determine

---

[1] Bass cites Illinois's standard instructions to show that some other jurisdictions have standard instructions telling jurors they may consider a defendant's reputation for peacefulness. The State cites *Fenelon v. State*, 594 So. 2d 292 (Fla. 1992), to argue that the requested instruction would constitute an improper comment on the weight of the evidence. Although it is true that "[a] judge may not sum up the evidence or comment to the jury upon the weight of the evidence," § 90.106, Fla. Stat., and that "jury instructions that amount[] to judicial comment on the evidence . . . are impermissible," *Brown v. State*, 11 So. 3d 428, 434 (Fla. 2d DCA 2009), we need not decide whether the requested instruction would have been impermissible. Either way, it was no abuse of discretion to deny the request.

whether juror misconduct had occurred, whether the juror had been denied the ability to ask questions of the court, and whether the verdict had been decided by lot.

A trial court, in its discretion, may enter an order permitting parties to interview a juror and must do so if it finds a reason to believe a verdict may be subject to challenge. Fla. R. Crim. P. 3.575. However, "Florida's Evidence Code . . . absolutely forbids any judicial inquiry into emotions, mental processes, or mistaken beliefs of jurors." *Baptist Hosp. of Miami, Inc. v. Maler*, 579 So. 2d 97, 99 (Fla. 1991) (citation omitted); *see also* § 90.607(2)(b), Fla. Stat. (2017). This includes inquiries into whether a juror "did not assent to the verdict; that he misunderstood the instructions of the Court[,] the statements of witnesses[,] or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow-jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast." *Maler*, 579 So. 2d at 99.

We review a trial court's denial of a motion to interview jurors for abuse of discretion, *Anderson v. State*, 18 So. 3d 501, 519 (Fla. 2009), and we find none here.

III.

Bass next argues that the trial court erred by admitting a photograph of Healey's injuries that he contends was so gruesome that the danger of unfair prejudice outweighed any probative value. Bass argues this was particularly so because the photograph was cumulative of another admitted photograph. Trial courts should exclude photographs that are "so shocking in nature as to defeat the value of their relevance" and distract the jury from "a fair and unimpassioned consideration of the evidence." *Czubak v. State*, 570 So. 2d 925, 928 (Fla. 1990) (citations omitted). But "just because a photograph is gruesome does not make the photograph inadmissible." *Victorino v. State*, 127 So. 3d 478, 499 (Fla. 2013) (quoting *Hampton v. State*, 103 So. 3d 98, 115 (Fla. 2012)). Trial courts have broad discretion in determining whether a photograph should come in, *Brooks v. State*, 787 So. 2d 765, 781 (Fla. 2001), and in this case, we find the court acted within that broad discretion.

4

## IV.

Fourth, Bass contends that the trial court was obligated to approve his proposed statement of the evidence. After this appeal began, Bass's appellate counsel heard that sometime during trial—either in front of the jury or in front of the judge during sentencing—the prosecutor called the battery at issue "just another notch in [Bass's] belt." Bass acknowledges this comment is not found in the record, and he asked this court to relinquish jurisdiction so he could attempt to supplement or correct the lower-court's record. We did relinquish jurisdiction, and Bass returned to the trial court, where he filed a statement of the evidence pursuant to Florida Rule of Appellate Procedure 9.200(b)(4). He included an affidavit from a lawyer who had been there and who swore that—to the best of his memory—that the prosecutor did indeed say "just another notch in [Bass's] belt," *either* during closing arguments or during sentencing. The State did not respond to the statement of evidence or offer any contradictory evidence.

In Bass's view, the State's inability to contradict the affidavit obligated the court to accept it as true: "In light of the fact that Appellant Bass submitted an unrefuted affidavit from an officer of the court confirming that the statement in question was made by the prosecutor, the trial court should have approved the statement of evidence." Init. Br. at 29. But Bass cites no authority to support that assertion, and we cannot accept the argument that a litigant can unilaterally alter the official record of what transpired below by doing nothing beyond offering a statement the other side cannot refute. "If a trial judge is able to approve a unilateral statement, the judge should do so, but the rule does not require it." *Rivera v. Rivera*, 863 So. 2d 489, 490 (Fla. 4th DCA 2004). Trial judges and opposing counsel may or may not remember every word said at trial, but when faced with a proposed statement of evidence that they cannot say accurately reflects what really happened, they are not obligated to accept it. Here, the trial judge concluded he could not "in good conscience find the statement was made." Under these circumstances, the judge did the right thing by refusing to vouch for a statement he could not confirm was ever uttered.

5

V.

Bass's fifth argument is that the trial court should have granted a judgment of acquittal on the resisting-an-officer charge. We review the trial court's decision de novo. *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002).

Section 843.02 provides that it is a crime to "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty." To support a conviction under this statute, the State must prove: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L. v. State*, 24 So. 3d 1181, 1185-86 (Fla. 2009).

Bass does not dispute the fact that the officer was engaged in the "lawful execution of a legal duty" when Bass gave a false identity. Nor does Bass contend on appeal that his giving a false identity did not constitute obstruction. Instead, Bass's sole argument is that the trial court should have granted an acquittal on this count because Bass was not detained when he lied to the officer. He relies on *Sauz v. State*, in which the Second District held that because the defendant was not lawfully detained, "his provision of the false name and date of birth did not constitute the crime of resisting an officer without violence." 27 So. 3d 226, 228 (Fla. 2d DCA 2010).

Bass correctly explains that the Second District has added an additional requirement for any section 843.02 charge, at least when the charge is based on giving an officer a false name. In those situations, the Second District has held there can be no conviction unless the defendant was legally detained when he gave the false name. *See id.*; *see also St. James v. State*, 903 So. 2d 1003 (Fla. 2d DCA 2005); *D.G. v. State*, 661 So. 2d 75 (Fla. 2d DCA 1995). But we cannot follow *Sauz* because we cannot establish an extratextual element the Legislature omitted.[2]

---

[2] In its supplemental brief, the State agreed with Bass that *Sauz* was correctly decided. (The State argues it should win nonetheless, arguing Bass was detained.) We of course must decide

In a separate statute, enacted in 1999, the Legislature did impose such a detention requirement for the crime of giving false identification to a law enforcement officer. *See* § 901.36(1), Fla. Stat. (2016) (specifically limiting applicability to when "a person . . . has been arrested or lawfully detained"). The Legislature could have added this language to section 843.02 as well, but it did not. Instead, section 843.02 applies "to *any* situation where a person willfully interferes with the lawful activities of the police." *N.H. v. State*, 890 So. 2d 514, 516 (Fla. 3d DCA 2005) (emphasis added) (holding that "[o]n its face, [section 843.02] is unambiguous"). We therefore hold that whether Bass was detained at the time of his lie does not matter for purposes of his motion for judgment of acquittal.

This court's decision in *M.M. v. State*, which cites *Sauz*, does not require otherwise; it did not adopt *Sauz*'s rule. *See* 51 So. 3d 614 (Fla 1st DCA 2011). In *M.M.*, this court held that a person not lawfully detained is "free to refuse to identify himself." *Id.* at 616. But we said nothing about the situation here, where—rather than remaining silent—the defendant elected to provide a false identity. It would be a mistake to treat a defendant who maintains his silence the same as one who affirmatively lies to officers investigating a crime. And although *M.M.* noted in dicta that a person's words alone "can rarely" support an obstruction charge absent detention, *id.*, rarely is not never. And none of the cases cited to support that dicta involved a defendant who did what Bass did: lie to an investigating officer. *See, e.g., S.G.K. v. State*, 657 So. 2d 1246, 1248 (Fla. 1st DCA 1995) (flight alone was not obstruction); *R.S. v. State*, 531 So. 2d 1026 (Fla. 1st DCA 1988) (no obstruction where individual who was not detained refused to answer questions and encouraged others to refuse). *M.M.* and the cases it relied on held only that an individual who is not detained may refuse to cooperate with police; those cases do not hold that a person willfully misleading an investigating officer cannot violate section 843.02 unless he happens to be detained.

---

ourselves whether to follow *Sauz. See Markham v. N. Florida Evaluation & Treatment Ctr.*, 248 So. 3d 1274 (Fla. 1st DCA 2018) (noting that courts are not bound by appellees' concessions).

This court's opinion in *Jackson v. State* does not control here either. *See* 1 So. 3d 273 (Fla. 1st DCA 2009). In *Jackson*, this court said that "[t]he giving of a false name is not a crime unless it occurs during a lawful detention or arrest." *Id.* at 277. But we said that in the context of section 901.36(1), Florida Statutes, which we cited along with a case applying it. That statute's plain text, again, limits application to when "a person . . . has been arrested or lawfully detained by a law enforcement officer." The plain text of section 843.02 does not.

We are not persuaded by the dissent's contrary take on this issue. In the dissent's view, the officer could not have been acting in the "lawful execution of a legal duty" *unless* he was detaining Bass. The dissent contends decisions like *Sauz* do not really add an extratextual detention element but merely "recogniz[e] that the 'lawful detention' of a suspect fulfills the statutory requirement [of] 'lawful execution of a legal duty,'" at least where the case turns on false information. Dissent at 15. Critically, Bass himself never makes this argument, and he has never argued that the officers were not operating in the lawful execution of their legal duty. We cannot reverse a judgment based on an argument the appellant never made. *See Williams v. State*, 845 So. 2d 987, 989 (Fla. 1st DCA 2003) ("Because appellant failed to raise these issues in the initial brief, we cannot consider them."). But regardless, we do not see how *Sauz* could stand for the proposition that detention is merely a means of satisfying the legal-duty requirement when the court in *Sauz* found the legal-duty element satisfied and the separate (extratextual) detention element *not* satisfied. 27 So. 3d at 228 (acknowledging that the detective "was engaged in the lawful execution of a legal duty because she was investigating the lewd battery" but nonetheless reversing because "while Sauz provided patently false information to [the detective], he did so at a time when he was not lawfully detained"). The "lawful duty" the statute requires and the "lawful detention" *Sauz* (but not the statute) requires are not always one in the same.

Moreover, detaining someone is not the only way an officer can lawfully exercise a duty. The dissent cites cases holding, for example, that an officer is executing a legal duty if he asks "for assistance with an ongoing emergency." Dissent at 12-13 (quoting *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995)); *accord S.G. v.*

8

*State*, 252 So. 3d 323, 325 (Fla. 1st DCA 2018) ("Legal duties include things like serving process, legally detaining a person, or asking for assistance in an emergency situation."); *Brandful v. State*, 858 So. 2d 367, 370 (Fla. 3d DCA 2003) ("[I]nvestigating a complaint constitutes the lawful execution of a legal duty."); *Francis v. State*, 736 So. 2d 97, 99 n.1 (Fla. 4th DCA 1999) ("It is undisputed that the state satisfied the first prong of this test in that [the officer] was investigating a 911 telephone call when the alleged obstruction occurred."); *V.L. v. State*, 790 So. 2d 1140, 1142 (Fla. 5th DCA 2001) ("The investigation of a crime by a police officer is an execution of a lawful duty").[3] The dissent does not explain, though, what comes of the detention requirement if the officer is executing some other legal duty—a duty not involving detention. If the point is that a defendant must be detained to satisfy the statutory legal-duty prong (at least in false-name cases), that sounds a lot like saying detention is the only means of satisfying the statutory legal-duty prong.[4] The statutory language (and cases applying the statute) do not support that conclusion.

Finally, if the detention requirement were merely a restatement of the legal-duty requirement, we do not understand why it would only apply to false-name cases. Violations of section

---

[3] There is perhaps some disagreement among the cases about what all constitutes execution of a legal duty. *Compare, e.g.*, *Davis v. State*, 973 So. 2d 1277, 1279 (Fla. 2d DCA 2008) (rejecting argument that officers responding to a complaint were engaged in the lawful execution of a legal duty where there was no evidence the officers had reasonable suspicion that a particular individual had committed a crime) *with Suaz*, 27 So. 3d at 228 (officer "was engaged in the lawful execution of a legal duty because she was investigating the lewd battery"). But because Bass has never argued that the officers were not executing a legal duty, we need not resolve that disagreement here.

[4] It is also noteworthy that section 843.02 prohibits obstruction not only of police officers, but also many others, including "member[s] of the Florida Commission on Offender Review," "any administrative aide or supervisor employed by the commission," and any "county probation officer."

843.02 come in many forms, and not all involve lying to officers about names. The legal-duty requirement applies in every section 843.02 case. *See C.E.L.*, 24 So. 3d at 1185-86 (noting required element is that "the officer was engaged in the lawful execution of a legal duty"). Yet the judicially created detention requirement seems to be limited to false-name cases. This is another indication that the rule—created by courts—strays from the statutory text.

Sections 843.02 and 901.36(1) establish different crimes with different elements. The former requires obstruction; the latter requires detention. Bass was charged with the former and not the latter. Thus the State had to prove obstruction but not detention. We therefore need not address the State's argument that Bass was, in fact, detained—it does not matter here. Because Bass's only argument here was that the State failed to prove detention, we affirm.

VI.

Last, Bass argues that there were errors in his "sentencing paperwork" below. He contends that "victim data sheets" incorrectly state that he was convicted of three counts of aggravated battery, even though he was convicted of only one count of felony battery. He also contends that the paperwork wrongly lists as victims two men other than Healey. In the trial court, Bass filed a motion to correct sentencing error pursuant to Florida Rule of Criminal Procedure 3.800(b)(2). The court denied it, concluding that "the motion fails to show the relief requested relates to the legality of the sentences imposed." The court also noted that the because "victim data sheets are not orders entered as the result of the Court's sentencing process, the relief would be better sought from the agency responsible for their preparation." Indeed, Bass has cited no authority for the proposition that we are obligated (or even permitted) to direct the trial court to modify paperwork it did not create. The record does not show why this paperwork was created or who prepared it. But to the extent Bass is aggrieved by errors in papers prepared by someone other than the trial court, he will have to seek relief elsewhere.

AFFIRMED.

10

RAY and WINSOR, JJ., concur; MAKAR, J., concurs in part and dissents in part with opinion.

––––––––––––––––––––––

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

––––––––––––––––––––––

MAKAR, J., concurring in part and dissenting in part.

In Florida, when is giving a false name to a police officer a crime? In 1999, the legislature enacted a "false name" law that specifically addressed the matter, section 901.36, Florida Statutes, which says: "It is unlawful for a person *who has been arrested or lawfully detained by a law enforcement officer* to give a false name, or otherwise falsely identify himself or herself in any way, to the law enforcement officer or any county jail personnel." § 901.36(1), Fla. Stat. (2018) (emphasis added); Laws of Florida, Chapter 99-169, § 2 (violations are a first degree misdemeanor). As emphasized, an arrest or lawful detention is a specific element of the offense, thereby limiting the scope of the statute's application. *See Dubois v. State*, 932 So. 2d 298, 299 (Fla. 2d DCA 2006) ("To constitute a crime, the giving of the false name must occur during an arrest or lawful detention.") (citing § 901.36, Fla. Stat. (2004)); *see also Jackson v. State*, 1 So. 3d 273, 277 (Fla. 1st DCA 2009) (same) (concluding that because defendant "gave the false names before he was detained, it was improper to conclude that the arrest for the offense of giving a false name was lawful").

Prior to and since 1999, giving a false name could also be deemed illegal under another statute, section 843.02, Florida Statutes,[1] which criminalizes resisting, obstructing, or opposing

––––––––––––––––––––––

[1] Section 843.02, in relevant part, states:

Whoever shall resist, obstruct, or oppose any officer . . . or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the

an officer without violence. This general obstruction statute requires that: "(1) the officer was engaged in the *lawful execution of a legal duty*; and (2) the action by the defendant constituted obstruction or resistance *of that lawful duty*." *S.G.K. v. State*, 657 So. 2d 1246, 1247 (Fla. 1st DCA 1995) (emphasis added). As emphasized, section 843.02 criminalizes conduct that obstructs or resists an officer in the *lawful execution of a legal duty*. For this reason, courts make clear that "it is important to distinguish between a police officer 'in the lawful execution of any legal duty' and a police officer who is merely on the job." *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995). Absent an identifiable legal duty, its lawful execution by an officer, and obstruction/resistance of that duty,[2] section 843.02 is not violated. *Id.* (noting that a legal duty

_____

> person of the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

§ 843.02, Fla. Stat. (2017). Since 1999, false name cases have been reported under both statutes.

[2] As an example, giving a false name and then recanting before an officer has engaged in substantial efforts at identification of a detainee does not amount to obstruction sufficient to support a violation. *Compare L.T. v. State*, 69 So. 3d 1014, 1016 (Fla. 3d DCA 2011) ("[O]fficers knew [minor's] identity almost immediately upon encountering him and the arresting officer testified that the false name given by [the minor] impeded his investigation for about a second."), *and C.T. v. State*, 481 So. 2d 9, 10 (Fla. 1st DCA 1985) (No "real harm was done" where juvenile gave false information that was written on a traffic citation and "run through the police computer" where "the juvenile promptly and voluntarily recanted the false information and thus did not interfere with the officer's performance of his duties other than by causing a relatively insignificant loss of time."), *with Fripp v. State*, 766 So. 2d 252, 254 (Fla. 4th DCA 2000) (upholding conviction where defendant "twice gave a false name at the scene of the stop and did not correct the falsehood until he was at the booking desk *after* he was arrested and transported to the police station").

can arise where an officer is executing service of process on a person, has legally detained a person, or has asked "for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property").

In this case, the State did not charge Bass with a false name violation under section 901.36. Instead, it charged him under the general obstruction statute, section 843.02, which the State says was properly applied to Bass because he gave a false name while he was lawfully detained that obstructed the officer's investigation at the crime scene. Bass, of course, disputes that he was lawfully detained or that the officer was engaged in the exercise of a legal duty, which is the only basis upon he and the State have disagreed in this appeal.

In its supplemental brief,[3] the State unequivocally says that lawful detention is required in false name cases under section 843.02, as other district courts have held; it specifically "agrees that the Second District Court of Appeal's holding in *Sauz v. State*, 27 So. 3d 226 (Fla. 2d DCA 2010), that legal detention is required for a person to be arrested for resisting without violence, is correct." Its supplemental reply brief concludes that the only dispute is whether the record establishes that Bass was lawfully detained based on a reasonable suspicion of criminal activity. Bass too agrees that *Sauz* applies, and that lawful detention is required when section 843.02 is applied in false name cases; he says, however, that he was not lawfully detained when he gave the false

---

[3] The parties were "directed to file supplemental briefs addressing the elements of the crime of Resisting Officer without Violence, section 843.02, Florida Statutes (2012), and whether the Second District Court of Appeal's opinion in *Sauz v. State*, 27 So. 3d 226 (Fla. 2d DCA 2010), correctly decided that lawful detention or arrest is a condition precedent to a violation of the statute when the violation is based on giving a false name or false information." Their briefs were required to "address the distinction between the elements the State would need to prove for the crimes of Resisting Officer without Violence, section 843.02, and Giving False Name or Identification to Law Enforcement Officer, section 901.36(1), as applied to the facts of this case."

name. Neither Bass nor the State concede that *Sauz* adds an "additional requirement" to the statute.

The reason Bass and the State agree that lawful detention is required in this case is that Florida appellate courts have uniformly required that the defendant be lawfully detained (or arrested) at the time false information is given (or name refused to be given) for an unlawful obstruction to be actionable under section 843.02. *M.M. v. State*, 51 So. 3d 614, 616 (Fla. 1st DCA 2011); *Sauz*, 27 So. 3d at 228; *D.G.*, 661 So. 2d at 76; *see also D.L. v. State*, 87 So. 3d 824, 825 (Fla. 2d DCA 2012); *St. James v. State*, 903 So. 2d 1003, 1004 (Fla. 2d DCA 2005); *Rodriguez v. State*, 29 So. 3d 310, 312-13 (Fla. 3d DCA 2009).

After all, this class of cases involves *investigatory detentions*. Section 843.02 requires that a defendant's conduct have obstructed the officer in the "lawful execution of any legal duty," which in the context of an investigation is the lawful detention of an individual for which a well-founded suspicion of criminal activity exists. *See Harris v. State*, 647 So. 2d 206, 208 (Fla. 1st DCA 1994) ("[T]he crime of resisting an officer without violence did not take place if *either* [the officer] lacked an articulable well founded suspicion of criminal activity to justify the attempt to detain [the defendant] *or* if [the defendant] had no reason to believe that he was being detained."). The element of "lawful execution of a legal duty" is described as follows:

> In resisting cases involving an investigatory detention, the state must prove that the officer had a reasonable suspicion of criminal activity. . . . As the Third District has stated: "*The element of lawful execution of a legal duty is satisfied if an officer has either a founded suspicion to stop the person or probable cause to make a warrantless arrest.* Otherwise, the individual has a right to ignore the police and go about his business." *O.B. v. State*, 36 So. 3d 784, 786 (Fla. 3d DCA 2010) (citations and internal quotations omitted).

*A.R. v. State*, 127 So. 3d 650, 653-54 (Fla. 4th DCA 2013) (emphasis added). The italicized language punctuates that a lawful detention is merely the by-product of the proper execution of the legal duty

14

to detain someone reasonably suspected of having committed a crime. If a detainee gives a false name while lawfully detained, and that action amounts to "resisting, obstructing, or opposing" that lawful duty, a violation is established.

Viewed in this way, courts are not interlineating a "lawful detention" requirement into the statutory language of section 843.02 in false information cases; rather, they are recognizing that the "lawful detention" of a suspect fulfills the statutory requirement that an officer be engaged in the "lawful execution of a legal duty" at the time false information is given. "Lawful detention" thereby satisfies the first element (i.e., that the "officer was engaged in the lawful execution of a legal duty"). The second element is satisfied if the giving of the false name to the officer "constituted obstruction or resistance of that lawful duty." As such, section 843.02 is not violated simply because "obstruction or resistance" of police activity occurred; it must occur via conduct that interfered with the "lawful execution of a legal duty." Obstruction is a necessary element of a section 843.02 violation; but so is proof of the lawful execution of a legal duty, such as a lawful detention (or arrest).[4]

Lawful detention in false name cases under section 843.02 serves the purpose of drawing a line between situations in which an officer is engaged in the "lawful execution of a legal duty" and those in which the officer is customarily engaged from day-to-day (i.e., "merely on the job"). Criminalizing the giving of a false name when a person is lawfully detained makes sense, but criminalizing such conduct in the context of police-citizen investigatory encounters generally—without an arrest or lawful detention[5]–goes

---

[4] In contrast, by enacting section 901.36(1), the Legislature created a new offense, one that criminalizes giving a false name when arrested or lawfully detained, without the need to prove that the giving of a false name "constituted obstruction or resistance" of the arrest or detention.

[5] The Florida Supreme Court identified the three levels of police-citizen encounters as follows:

beyond the legislative intent of section 843.02, which says the conduct must obstruct the execution of a legal duty.

The view that section 843.02 criminalizes the giving of a false name (or refusal to give a name), even when not lawfully detained or arrested, opens up vast vistas of criminal liability for what historically has been deemed non-criminal conduct.[6] Section 843.02 does not give police officers the authority to arrest citizens who refuse to cooperate with—or choose to give false or incorrect

> The first level is considered a consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked. . . . The second level of police-citizen encounters involves an investigatory stop . . . . At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. . . . In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop. . . . [T]he third level of police-citizen encounters involves an arrest which must be supported by probable cause that a crime has been or is being committed.

*Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993) (citations omitted).

[6] Citizens generally have the right to not interact with police unless they are lawfully compelled to do so. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (When "an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.") (characterizing its holding in *Florida v. Royer*, 460 U.S. 491 (1983)); *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

16

information during—the officer's investigatory efforts unless the officers are lawfully executing a legal duty, such as a lawful detention of a suspect for whom reasonable suspicion exists. On this point, the Second District said twenty years ago:

> [Florida cases] seem to support the following general proposition: If a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property, the person's words alone can rarely, if ever, rise to the level of an obstruction. Thus, obstructive conduct rather than offensive words are normally required to support a conviction under this statute.

*D.G.*, 661 So. 2d at 76. Cases since that time have followed this viewpoint. *See, e.g.*, *M.M.*, 51 So. 3d at 616; *Sanchez v. State*, 89 So. 3d 912, 915 (Fla. 2d DCA 2012); *State v. Legnosky*, 27 So. 3d 794, 797-98 (Fla. 2d DCA 2010); *State v. Dennis*, 684 So. 2d 848, 849 (Fla. 3d DCA 1996); *W.W. v. State*, 993 So. 2d 1182, 1184 (Fla. 4th DCA 2008); *Jay v. State*, 731 So. 2d 774, 775 (Fla. 4th DCA 1999).

And section 843.02 is symmetrical: it applies whether a false name is given, or no name is given, when a person is legally detained or arrested. *See M.M.*, 51 So. 3d at 616 (holding that a juvenile defendant's failure to provide police with his identity was not obstruction); *Sanchez*, 89 So. 3d at 915 (holding that the defendant's act of giving the police false information without more did not support conviction); *D.L.*, 87 So. 3d at 826 (holding that a juvenile defendant's act of giving a false name to police did not constitute obstruction); *St. James*, 903 So. 2d at 1004 (holding that defendant's denial of his identity to police was insufficient to support a charge of obstruction).

Dispensing with the "lawful detention" requirement in false information cases under section 843.02 creates direct conflict with *Sauz* and other cases that trial courts have applied for decades. It also creates conflict with this Court's decision in *M.M. v. State*, which held in a section 843.02 case as follows:

"If a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property, the person's words alone can rarely . . . rise to the level of obstruction." *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995). Providing false information to a police officer during a valid arrest or *Terry* stop can rise to that level. *See Sauz v. State*, 27 So. 3d 226, 227 (Fla. 2d DCA 2010). *But failing to give one's correct identity is not a crime unless the person is legally detained.*

51 So. 3d at 616 (footnote omitted) (emphasis added). Because the juvenile in *M.M.* "was not under *arrest* or otherwise *lawfully detained* when he declined to give [the officer] his name or provide identification. . . . *[he] did not obstruct the officer in executing a legal duty*." *Id.* (emphasis added). These italicized statements—that lawful detention (or arrest) meet the statutory element of a lawfully executed legal duty—conflict with the majority's elimination of lawful detention in investigatory detention cases. The upshot is an affirmance of Bass's obstruction conviction without identifying what legal duty the officer was lawfully executing when Bass provided a false name. What recognized legal duty could the officer have been lawfully executing in this case other than an investigatory detention of someone suspected of a crime?

Turning to this case, the briefings and arguments make clear that the parties have argued only about whether Bass gave a false name while lawfully detained; they both agree that lawful detention is required in an investigatory detention case, as their supplemental briefs unequivocally confirm. The only question is whether Bass was lawfully detained at the time he gave the officer a false name.

As to this question, the evidence shows that he was not. Two officers testified at trial. Sgt. Dunsford, who responded to the 911 call on New Year's Eve 2012, arrived at the scene, which was chaotic due to uncertainty about what happened and the presence

18

of several injured persons. All Sgt. Dunsford knew was that a call had been received that "somebody had gotten hit and fell into a [bon]fire." He approached and talked with Bass and another man, neither of whom the officer knew. Bass told the officer an altercation had occurred but he didn't know what had happened. The officer continued to make "idle chatter," keeping an eye on both men, urging them to walk to where others had gathered ("Hey, let's walk up to the hill where everybody else was congregating at."). At that point, Sgt. Dunsford heard "some yelling and cussing up the hill," and determined it was not a threat. During that time, Bass went to his nearby truck and removed his red shirt and hat. When he saw Bass leaning into the truck, Sgt. Dunsford told Bass to step away from it and to come to the officer as a safety precaution. Bass did so and told the officer he could search his truck, which Sgt. Dunsford did, finding no weapons or other contraband. As other officers arrived, Sgt. Dunsford left to assist elsewhere at the scene, having no contact with Bass thereafter. Of note, Sgt. Dunsford never asked for or was given a name by Bass ("A: . . . I don't believe I asked him what his name was at the time. Q: And you don't recall him ever giving you one. A: No, Sir.").

Another officer on the scene, Deputy Ross, immediately followed up on Sgt. Dunsford's questioning of Bass. He also continued the search of Bass's truck during which Bass said his name was "Dillon Barns." Deputy Ross then leaned into the driver's side of Bass's truck, finding a "lanyard with a plastic case that would commonly have identification in it, and right on the front identification was a picture ID, and it said Devin Bass, and I noticed that individual looked strikingly similar to the person who just told me he was Dillon Barns. . . . At that point I realized that this person was probably not telling me the truth." The discovery of the identification card prompted him to challenge Bass, who insisted the truck and identification belonged to a friend. Bass gave a birthdate that was a year different from his friend's birthday, which prompted Deputy Ross to detain him and place him in his patrol car at that point ("Q: Do you detain him at that point? A: I did."). Deputy Ross soon confirmed Bass's identity in a stratagem by turning to Bass and saying "Hey, Devin," causing Bass to respond affirmatively ("I kind of told him, I said, I got you,

and he said, whatever, man."). Bass soon admitted to his true name.[7]

These facts do not establish a reasonable suspicion that Bass had committed a crime (or was about to commit a crime) at the time he said he was "Dillon Barns." Officers had a hunch about Bass as a possible suspect at the time when the false name was given, but more is necessary to establish the basis for a lawful detention. At best, Bass took off his hat and shirt and placed them in the truck, which may have been suspicious, but not a basis to detain him. And to the extent he was detained as he rummaged in his truck, the detention was based on a safety concern that was resolved straightaway. *See Terry v. Ohio*, 392 U.S. 1 (1968). When Sgt. Dunsford told Bass to step back from his truck, Bass did so while volunteering that the officer conduct a search of his truck, which yielded no weapon or contraband. Whatever safety concern that existed was quickly dispelled. It wasn't until after Deputy Ross found the lanyard and questioned Bass about it that he detained Bass and put him in his patrol car; Bass had already said he was "Dillon Barns." The evidence thereby fails to show a detention–let alone a lawful one–at the time Bass gave a false name, or a basis for Bass believing he was detained. *S.G.K.*, 657 So. 2d at 1248 ("Even if the officer had articulated a well-founded suspicion, the State failed to show appellant had any reason to believe he was being detained."). Notably, Deputy Ross had evidence of Bass's real name almost simultaneously with the falsehood; he clearly was not duped by Bass's lame attempt at subterfuge. And it was not until later that evidence developed supporting Bass's arrest. *See St. James*, 903 So. 2d at 1004 (Even though officers had probable cause to arrest defendant, he was "not legally detained when he denied his identity."). At best, the facts demonstrate a police investigation and "citizen encounter involving a verbally uncooperative citizen," which is insufficient to support a violation of section 843.02. *D.G.*, 661 So. 2d at 76.

_____

[7] The State relies on stricken trial testimony in claiming that Bass had been pointed out to Sgt. Dunsford and Deputy Ross as a possible suspect. Bass's counsel twice obtained favorable rulings on his objections that this testimony was inadmissible.

20

Finally, Bass and the State presented a limited issue in this appeal as to section 843.02's application in light of *Sauz*, whose holding and analytical underpinnings support reversal. The panel, however, expanded the scope of appellate review via post-argument supplement briefing. In doing so, the legal landscape was broadened, resulting in the majority deciding this case on a legal basis that *neither* party raised in the trial court or on appeal. Indeed, the majority's newly-raised and novel legal theory is one the State did not make and affirmatively repudiates. Bass and the State both say that *Sauz* and related cases—and presumably their reasoning—apply in this case. It is anomalous to affirm on a newly-fashioned legal theory that no party raised or supports, and ignore the reasoning underlying cases such as *Sauz* that matters most in interpreting section 843.02.

For these reasons, Bass's conviction for a violation of section 843.02, Florida Statutes, should be reversed; as to all other issues, I concur in affirmance.

_____

Michael Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Donna Gerace, Kaitlin Weiss, and Virginia Harris, Assistant Attorneys General, Tallahassee, for Appellee.